# UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |
|---|---|
| In the Matter of the Search of:<br>Information associated with account identified as<br>HUAZAJR@YAHOO.COM that is within the<br>possession, custody, or control of YAHOO, INC. )<br>)<br>)<br>)<br>)<br>) | Case No. 2:17-MJ-990 |

## APPLICATION FOR WARRANT PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A-2*

There are now concealed or contained the items described below:

*See Attachment B-2*

The basis for the search is:

☒ Evidence of a crime;
☒ Contraband, fruits of crime, or other items illegally possessed;
☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| *Code section(s)* | *Offense Description* |
|---|---|
| *See attached Affidavit* | *See attached Affidavit* |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

_____
*Applicant's signature*
DHS-ICE-OPR SA JEREMY M. O'HARA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

City and State: _____

_____
*Judge's signature*
Michael R. Wilner, U.S. Magistrate Judge
*Printed name and title*

AUSA: M. Jenkins (213) 894-2091

## Table of Contents

I.  INTRODUCTION...........................................1

II.  PURPOSE OF AFFIDAVIT..................................3

III. SUMMARY OF PROBABLE CAUSE............................4

IV.  STATEMENT OF PROBABLE CAUSE.........................5

 A.  OPR Received Evidence that HUAZA Falsely
  Impersonated a Federal Agent, Attempted to Extort
  a Victim, and Stole Identity Documents..........5

 B.  DEA Investigation into HUAZA Revealed That He Has
  a History of Falsely Representing Himself as a
  Federal Agent...................................10

 C.  HUAZA Used Stolen Identity Documents and Possibly
  Involved an Underage Girl in Pornographic
  Activities......................................13

 D.  HUAZA Falsely Represented Himself as a Federal
  Agent to Local Police, Possessed Stolen
  Identification Documents, and Possessed Suspected
  Contraband on the SUBJECT DEVICE................18

 E.  Initial Consent Review of The Subject Device....24

V.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES..........27

VI.  CONCLUSION...........................................31

## **AFFIDAVIT**

I, Jeremy M. O'Hara, being duly sworn, declare and state as follows:

### I.   **INTRODUCTION**

1.    I am a Senior Special Agent ("SSA") with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Office of Professional Responsibility ("OPR"), where I investigate matters concerning employee misconduct, bribery involving ICE employees, individuals who impersonate ICE employees, and individuals who commit the violations that injure or discredit the reputation of ICE.  I am assigned to the Office of the Special Agent in Charge, West ("SAC WEST") located in Long Beach, California.

2.    I have been assigned to SAC WEST since May 31, 2016, and have participated, as both the case agent and a supporting agent, in a variety of different types of investigations, such as: employee misconduct, sexual battery, stolen government property, and impersonation of a federal employee.

3.    Previously, I served as a Homeland Security Investigations ("HSI") Special Agent ("SA"), beginning in December, 2008.  As a SA, I investigated state and federal violations based in a variety of disciplines and served in different groups, such as: the Narcotics Smuggling group, the Border Enforcement Security Task Force ("BEST"), the SAC Intelligence Collections Program, as a member of the Los Angeles Interagency Metropolitan Police Apprehension Crime Task Force

("LA IMPACT"), and as an adjunct instructor at the Federal Law Enforcement Training Center ("FLETC").

4.    To become a SA, I received approximately three months of basic training, followed by approximately three months of advanced training at FLETC.  After completing my training, I was initially assigned to the HSI Narcotics Smuggling Group, Los Angeles.  After arriving at HSI, I successfully completed a two-year, on-the-job training program.

5.    While assigned to HSI, I have participated in numerous criminal investigations as either the case agent or an investigating agent.  In particular, I have participated in various aspects of criminal investigations, including: wiretapping telephones, telephone records analysis, electronic surveillance, physical surveillance, search warrants, and arrests.  I have also interviewed defendants, sources of information, confidential informants, and witnesses who had personal knowledge regarding criminal organizations and methodology.

6.    Prior to my career with DHS, I served as a state certified police officer in Michigan.  In 2001, I attended approximately four months of basic training at the Washtenaw Community College Police Academy in Ann Arbor, Michigan.  I successfully completed the training requirements for certification by the Michigan Commission on Law Enforcement Standards.  As a police officer, I received advanced training in a variety of disciplines and was involved in more than 100 arrests.

2

## II.   **PURPOSE OF AFFIDAVIT**

7.    This affidavit is made in support of an application for a warrant to search a disc in the custody of ICE OPR containing data from the following digital device, which was seized and then returned to OSCAR EDUARDO HUAZA-LOZANO ("HUAZA"):[1]

a.    One black Samsung cellular telephone, assigned telephone number (949) 394-6872[2], containing SIM Card Number 8901260805780242648F, and known to be used by HUAZA (the "SUBJECT DEVICE").

8.    This affidavit is additionally made in support of an application for a warrant to search the following email account:

a.    HUAZAJR@yahoo.com, which is believed to be used by HUAZA, and which is stored at premises controlled by Yahoo, Inc., a company that accepts service of legal process at its headquarters located in Sunnyvale, California (the "SUBJECT ACCOUNT"). I believe the SUBJECT ACCOUNT to contain the fraudulent application HUAZA submitted to create a CreditOne Bank card under the name of "Carlos Lara" (¶ 31).

9.    The requested search warrants seek authorization to seize any data captured from the SUBJECT DEVICE and the SUBJECT ACCOUNT that constitutes evidence or fruits of violations of: Title 15, United States Code (USC), § 1644: Fraudulent Use Of

---

[1] The disc has not been searched.

[2] As detailed further below, I know, through previous investigations, HUAZA has utilized telephone number (562) 726-5367 from as early as 2011 and likely did so utilizing the SUBJECT DEVICE.

3

Credit Cards; 18 USC § 912: Impersonation Of Officer Or Employee Of The United States; 18 USC § 1001: False Statement; 18 USC § 1028A: Aggravated Identity Theft; 18 USC § 1343: Wire Fraud; 18 U.S. Code § 2251: Sexual Exploitation Of Children; 21 USC § 846, Conspiracy to Commit Narcotic Offenses; (collectively, the "Subject Offenses").

10.   The SUBJECT DEVICE and SUBJECT ACCOUNT are identified in Attachments A-1, A-2 to the search warrant application, respectively.  The list of items to be seized is set forth in Attachments B-1, B-2 to the search warrant application, respectively.  Attachments A-1, A-2 and B-1, B-2 are incorporated herein by reference.

11.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  SUMMARY OF PROBABLE CAUSE

12.   The investigation began in response to a complaint that HUAZA, posing as "an ICE Officer", accepted money and a car from the complainant to remove the complainant's Order of Deportation and to file a motion to allow the complainant to legally remain in the United States.  To complete the motion,

4

HUAZA demanded the complainant's and his family's identity documents and personal information.  After failing to produce a motion, the complainant contacted HUAZA, with Santa Ana Police Department ("SAPD") officers, to retrieve his identity documents. HUAZA admitted, in front of SAPD officers, that he had mailed the complainant's documents and money via U.S. Mail; however, no such package was received.

13.   A few weeks after HUAZA was arrested by TPD, HUAZA was arrested by the Costa Mesa Police Department ("CMPD") for attempting to defraud an innkeeper.  Upon initial contact with CMPD, which was audio recorded, HUAZA identified himself as "an off-duty agent with Homeland Security" and provided a fictitious name, date of birth, and social security number.  Post arrest, HUAZA's true identity was discovered after his fingerprints were taken.  In HUAZA's possession were additional stolen identity documents.  I also discovered that HUAZA had traveled to the location he was arrested, 2200 Harbor Boulevard, Costa Mesa, utilizing a ride sharing service, "Go-Go Grandparent," which closed HUAZA's account because the payment method on HUAZA's account was the stolen account number belonging to "Sarah Dewing" of Fort Atkinson, Wisconsin.

### IV.   STATEMENT OF PROBABLE CAUSE

**A.   OPR Received Evidence that HUAZA Falsely Impersonated a Federal Agent, Attempted to Extort a Victim, and Stole Identity Documents**

14.   On September 9, 2016, a complainant (the "complainant") contacted ICE OPR and complained that HUAZA, who the complainant stated was an ICE Officer, had offered to help

5

the complainant with their immigration case, under the authority
of an ICE officer.  The complainant stated he paid HUAZA a total
of $1,800, in three payments, in exchange for HUAZA removing his
Order of Deportation and filing a motion for the complainant to
remain in the United States.  The complainant also requested the
assistance of ICE OPR in retrieving the personal identifying
documents that HUAZA took from the complainant purportedly to
prepare the motion, which documents HUAZA had then refused to
return.

15.   Through a check of various law enforcement databases
and DHS employee rosters, no record of HUAZA being, or having
previously been, an employee of any branch of DHS could be
located.

16.   During an interview with the complainant, and their
spouse, on September 20, 2016, I learned the following:

a.   When the complainant met HUAZA, HUAZA was wearing
uniform pants and boots, and verbally identified himself as
working "for Immigration", and indicated the bulge in his
clothing was his badge and issued duty firearm.

b.   When the complainant later received an Order of
Deportation, the complainant contacted HUAZA, verified HUAZA
represented that he still worked "for Immigration", and
requested advice.  HUAZA offered to assist the complainant and
initially left the final price for his service open, but later
narrowed the price to approximately $7,000 total cost for his
assistance.  The complainant agreed and HUAZA requested, and was
given, identity documents (namely, birth certificate- Mexico,

expired passport- Mexico, Citizenship and Immigrant Services ("CIS") and ICE paperwork, Correspondence with the complainant's Attorney, and family information containing personal identifiers) for the complainant, and the complainant's family. HUAZA then further requested, and received, a brown 2006 Cadillac CTS 4-door sedan the complainant owned and was offering for sale, as partial payment for his assistance.  The complainant was not provided a receipt or any proof that service had been rendered in accordance with their agreement.

       c.   The complainant's spouse reported they were concerned because, after providing the identity documents to HUAZA, they received a telephone call from a car dealership regarding a new vehicle loan for which they had not applied, suggesting that someone fraudulently used their identify documents.

       d.   When the complainant became concerned with HUAZA's legitimacy, the complainant confronted HUAZA, via telephone, to confirm that he worked for ICE as he claimed.  The telephone number for the cellular telephone HUAZA was using to communicate with the complainant was (562) 726-5367,[3] a T-Mobile issued telephone number.  HUAZA became agitated, hung up the telephone, and then called the complainant from (213) 830-7911, which I know to be the number for the receptionist at the ICE Enforcement and Removal Operations ("ERO") office in Los

---

[3] During a search of law enforcement databases, I located the telephone number: (562) 726-5367 linked to HUAZA's name, date of birth, current and past addresses through phone and Experian records.

Angeles, California, to convince the complainant of his employment with ICE.  The complainant called the ERO number back after HUAZA's call to verify HUAZA's employment with ICE, but the receptionist would neither confirm, nor deny, HUAZA's employment as an ICE employee.[4]  However, based on my experience, I know that when a caller receives a legitimate call from ERO, Los Angeles, the caller ID screen displays "0000000000", not the ERO desk number.

17.   Based on my training and experience, I believe HUAZA "spoofed" ICE's telephone number in an attempt to support his fictitious employment credentials and to further his fraud. Spoofing is where a mobile application is used to send a fictitious originating number, created by the caller, to the receiving phone.

18.   According to the complainant, HUAZA also sent pictures, via the T-Mobile messaging service from telephone number (562) 726-5367,[5] of Freedom of Information Act ("FOIA") documents that HUAZA claimed he had gathered to support the complainant's immigration motion.  I reviewed the pictures and

---

[4] I know this to be is consistent with standard safety practice when unknown persons call seeking acknowledgment of ICE personnel.

[5] During communication with the complainant in July, 2016, HUAZA sent screenshots from his smartphone via picture messaging (from T-Mobile telephone number 562-726-5367), which appeared to me to be a Samsung smartphone, based upon the typeset and formatting on the screenshot.  Additionally, I checked the International Mobile Equipment Identifier ("IMEI") for the T-Mobile device used to send the images to the complainant and I learned the device was a Samsung Galaxy.  Based on the foregoing, I believe it is likely that this Samsung Galaxy is the SUBJECT DEVICE.

8

consulted with the DHS FOIA Officer Catrina Pavlik-Keenan ("FOIA officer"), who was listed on one of the documents HUAZA sent.  We concluded the pictures of the FOIA documents HUAZA provided were for another individual, who I believe to be an additional victim of HUAZA's fraud.  This is because the FOIA officer informed me there was no record of the complainant, nor HUAZA, ever ordering documents from the FOIA office; therefore, I believe the sent documents were likely obtained from the FOIA office by another victim and turned over to HUAZA, to satisfy HUAZA's request for identification documents required to produce his fictitious motion.  I believe the request for identification documents is part of HUAZA's ongoing scheme to gather information to conduct identity theft.

19.  Prior to contacting ICE, the complainant told me he had contacted SAPD for assistance.  On August 26, 2017, I contacted SAPD and spoke with Officer ("Ofc.") Moises Jimenez. Ofc. Jimenez provided a copy of the SAPD Incident Log for August 26, 2016, and told me he accompanied the complainant to HUAZA's residence, located at 3050 South Bristol Street, Unit 9P, Santa Ana, California, to keep the peace while the complainant demanded the family's identity documents be returned.  HUAZA admitted, in Ofc. Jimenez's presence, that he had possessed the complainant's identity documents and had monies received from the complainant, but informed the complainant, that he had mailed a package containing the family's documents, along with the monies, to the complainant's residence.  According to the complainant, no such package was ever received by the complainant or his family.

HUAZA also directly told Ofc. Jimenez he could not provide any proof that he mailed back the documents.

**B.    DEA Investigation into HUAZA Revealed That He Has a History of Falsely Representing Himself as a Federal Agent**

20.    During my law enforcement queries into HUAZA's background, I discovered that he was a subject in an investigation by the Drug Enforcement Administration ("DEA"), Los Angeles, for his involvement in illicit narcotic transactions. Accordingly, I had discussions with former DEA SA Michael Garland, who was the case agent, and reviewed DEA reports, wiretap transcripts, and listened to audio recordings captured during the state wiretap investigation.  SA Garland told me he had identified HUAZA as a narcotic's broker,[6] and while investigating HUAZA they identified individuals in actual possession of narcotics.  Though investigated and captured in recordings, HUAZA was never arrested because the case transitioned to the actual possessors of the narcotics through the investigation of HUAZA's activities and communications.

21.    During additional conversation with DEA agents, task force officers, and while reviewing DEA investigative files, I learned that while monitoring HUAZA's narcotic based discussions and conducting physical surveillance of HUAZA's narcotic based activities, the DEA had inadvertently developed evidence that

---

[6] A narcotics broker is an individual who networks with both individuals and organizations offering narcotics for sale and individuals and organizations seeking to purchase and resell narcotics for profit.  The broker is paid a percentage of the sale as a fee for connecting buyers with suppliers.

HUAZA, along with other co-conspirators, operated a storefront called "JB Associates"7 in Signal Hill, California, where investigators believed he offered illicit and fraudulent immigration services.  Though DEA agents originally believed the immigration talk could have been coded language to disguise HUAZA's narcotics discussions, DEA SA Garland eventually came to believe that HUAZA was actually involved in illicit immigration activities.

22.   HUAZA later stated in an interview with CMPD that he owned "JB Associates" and worked as a paralegal, with an unidentified female attorney, offering immigration and criminal legal services.  The DEA investigation confirmed HUAZA's presence at "JB Associates" during physical surveillance and, based on recordings, some of which I have reviewed, HUAZA was communicating with several individuals regarding immigration services.

23.   For example, HUAZA told one individual he would "collaborate" with him and make "it seem like an application existed in the past" so the individual would be eligible for the "245E" program (the actual program was the 245I program),8 which

---

7 A review of HUAZA's Alien file ("A-file") revealed HUAZA listed himself as a salesperson at "JB Associates" when applying for an immigration benefit in 2010.

8 Based on my training and experience, I know the 245I program to be the Provisions of the LIFE Act, Section 245(i) that allows certain persons, who had an immigrant visa available but entered without inspection or otherwise violated their status (and thus are ineligible to apply for adjustment of status), to apply for immigration benefits if they pay a $1,000 penalty. The LIFE Act temporarily extended the ability to preserve eligibility until

required presence in the United States prior to December 21, 2000, and an application/petition filed prior to April 30, 2001. HUAZA told the individual "what I can do is that I can help you by making it seem like an application existed in the past… there was already an existing 245 application," "I'll help you so it appears in the system that someone had submitted an application for you back then", and "it would take about 90 days, so it appears in the system. I'll check it, and I'll tell you when it's ready. You appear now, so submit your paperwork."  Based on my training, experience and knowledge of this investigation, I believe HUAZA's was working in conjunction with a corrupt employee inside DHS, who could fraudulently insert counterfeit or altered paperwork into the alien's A-file, which is the official hardcopy file created that follows an alien's application for an immigration benefit from initial application through the granting of all benefits conferred.  If a corrupt DHS employee inserted improperly dated paperwork as described by HUAZA, a CIS adjudicator would view the paperwork as official, due to its placement in the secure file, and the papers would create grounds for the ineligible alien to appear eligible for the 245I program.

24.    Additionally, the DEA's recordings revealed that HUAZA made statements to numerous individuals falsely claiming to

---

April 30, 2001.  To have been eligible, you must have been the beneficiary of certain identified immigration relief.  Further, the if you are the beneficiary of an application that was filed after January 14, 1998, and on or before April 30, 2001, you must have been physically present in the United States on December 21, 2000, if the qualifying application was filed after January 14, 1998.

be a federal and state law enforcement officer, including: "I work at LAX. I am an immigration officer", "I'm a federal agent", "I'm a police officer", and "you know I am talking to you as an officer".

   **C.   HUAZA Used Stolen Identity Documents and Possibly Involved an Underage Girl in Pornographic Activities**

   25.   According to the (Dominos) driver, whom I spoke with, and an incident report from TPD detailing the investigation of the driver's complaint that I reviewed, I learned the following regarding an incident involving HUAZA that occurred on March 10, 2017.

   26.   According to the driver, on March 10, 2017, HUAZA ordered a pizza from Dominos via an online order.9  When the driver arrived at HUAZA's motel room, #266, at the Key Inn in Tustin, California, he observed two males in the room, HUAZA and an older man speaking a similar dialect of Spanish, which the driver identified as Bolivian or Columbian.10  HUAZA told the driver in Spanish he had paid for the pizza online.  The driver stated he did not have a record of the online payment and needed a credit card.  HUAZA then produced a bright green Fidelity

_____

   9HUAZA was arrested by TPD shortly after using telephone number (562) 726-5367 to order a Dominos pizza online.  During his arrest, HUAZA denied ownership of a black Samsung Galaxy (or any cellular telephone) located in the motel room, which was rented by HUAZA.  The Samsung Galaxy was listed, along with a LG cellular telephone, on the property card of the minor female, who was arrested with HUAZA.  Moreover, the TPD arrest was just 11 days prior to the CMPD arrest during which the SUBJECT DEVICE was seized from HUAZA.  Therefore, I believe the Samsung Galaxy listed on the minor female's property card was likely the SUBJECT DEVICE.

   10 The driver was also a Spanish speaker.

Investment Rewards American Express Card from his left pants pocket and presented it to the driver. The driver noticed the name was "Johng Glenn Hayes" on the card, but the driver's record showed the order was for "Oscar Lozano".  The driver, who was suspicious, took a photograph of the Fidelity card with his cellular telephone and told HUAZA it was Dominos' policy that he was required to see HUAZA's identification and asked HUAZA if the American Express was his credit card.  HUAZA replied it was.  The driver then asked HUAZA if he was "John" and HUAZA replied "yes". The driver called the credit card number into the Dominos store while he waited for the identification.  HUAZA, who the driver stated was nervous and looking up and down the walkway, checked his pockets and was unable to produce identification. Nevertheless, the driver provided HUAZA the pizza and returned to his store.  Later, at the end of the driver's shift, the driver learned the credit card HUAZA presented had been declined.

27.    The driver returned to HUAZA's motel room.  The driver re-contacted HUAZA and demanded payment for the delivered pizzas.  The driver told HUAZA the credit card had been declined and he needed to pay for his pizzas.  HUAZA became enraged, yelled profanity at the driver, ordered the driver to leave, attempted a two-handed shove into the driver's chest (which the driver side-stepped), and then threatened the driver and told him that he (HUAZA) worked for "Immigration" and again ordered the driver to leave.  The driver told HUAZA that if he worked for immigration, he should have $32 to pay for his pizza.  HUAZA, still enraged, then removed his cellular telephone, which I

believe to be the SUBJECT DEVICE, and began to record the driver;
HUAZA told the driver he (HUAZA) was making pornographic film and
the driver felt HUAZA was threatening to include the driver in
the pornography if he did not leave.  The driver, who stated he
feared for his safety, returned to his store and contacted TPD.

28.  TPD responded to the Key Inn, Room #266, and made
contact with (who they later confirmed was) HUAZA.  Upon initial
contact with HUAZA, TPD noted that HUAZA's zipper was wide open,
and that he was in the company of (who they later confirmed was)
a minor female.  HUAZA initially identified the minor female as
his niece.  TPD also noted that the minor female appeared
disheveled,[11] the room was a studio design with an open floor
plan (except an enclosed restroom), and only had a single bed.
In plain view in HUAZA's room (from the entrance of the room),
TPD officers observed a digital scale, a pipe commonly used to
smoke methamphetamine, and a plastic baggie containing a white
substance the officers recognized as consistent with
methamphetamine.

29.  Officers detained HUAZA and then made contact with the
minor female inside the room, after she appeared from the
restroom and then fled back into the restroom (upon observing the
officers).  Upon contact, officers conducted a consent search of
the minor female inside the motel room.  As officers were
conducting the consent search of the female, they observed a
debit card belonging to "Carlos Lara" next to the suspected

---

[11] The older Hispanic male had apparently departed prior to
TPD's arrival.

15

methamphetamine.  The minor female stated she did not know who "Carlos Lara" was and that HUAZA was her uncle, although she did not know HUAZA's full name.12  Additionally, in plain view, officers observed a stack of credit cards on the south nightstand.  The top card on the stack was the American Express card that belonged to "Johng [sic] Glenn Hayes," which officers recognized as the card had been presented to the driver.13  The stack included: the California driver's license of "Carlos Lara", a medical card belonging to "Lucy R. Lara", and a Visa and Viejas card belonging to "John Glenn Hayes".  Inside a pair of jeans located in the room, officers discovered a debit card belonging to "Sam A. Reimer", a debit card belonging to HUAZA, and a piece of paper that appeared to TPD officers to have a credit card number written on it.14  Inside a black bag that HUAZA claimed was his, officers located the Social Security card of "Carlos A. Lara", a Visa credit card belonging to "Christian G. Kordt", a Mastercard belonging to "Adhora M. Hassan", a medical card belonging to "Lucy R. Lara", photocopies of checks for "Padilla & Associates, Inc.", assorted gift cards, and assorted pieces of paper that had names and addresses written on them.

---

12 The minor female was ultimately released to her parents and the investigation into her presence in the motel with HUAZA remains ongoing.

13 The driver had shown the photograph of the credit card presented by HUAZA to the TPD officers who took his complaint.

14 I believe the handwritten number to be a Fidelity FIS account number based on a check of the Bank Identification Number (BIN), which is comprised of the first 4-6 numbers on the credit/debit card.

16

30.   After reading HUAZA his Miranda rights, TPD officers asked HUAZA questions related to the items located in the room he rented, #266.  HUAZA denied ownership of any of the documents found inside the room, except for the items belonging to "Carlos Lara".  HUAZA claimed Mr. Lara was his friend and had been in the room earlier in the evening with his brother, Michael Lara. HUAZA claimed they departed just prior to the officers' arrival. HUAZA also stated the minor female was his niece, but later admitted they were not related, but they "considered each other that way".  When asked about the American Express card that HUAZA gave the driver to pay for the pizza, HUAZA stated the driver had found the card in the hallway and photographed it.  HUAZA stated he had discovered the other items belonging to Mr. Hayes in room #266 and collected them.

31.   During subsequent investigation, I spoke to each of the people whose documents were discovered.  I learned the items belonging to "Carlos Lara", "Lucy R. Lara", "John Glenn Hayes", "Adebra M. Hassan" and "Christian G. Kordt" were stolen, the majority in vehicle burglaries.  The Bank of America Business Account Debit card belonging to "Sam A. Reimer" was identified as missing by Mr. Reimer.  The checks for "Padilla & Associates, Inc." were written from a business account that Padilla & Associates was forced to close in July 2016 due to $3,631.88 in counterfeit check transactions.  During a discussion with Carlos Lara, he stated the following.  He was not at the Key Inn on March 10 or 11 and does not have a brother named Michael. Further, he and his brother are estranged and have not spoken or

seen one another in approximately four years.  Mr. Lara stated he does know anyone by the name of Oscar HUAZA-Lozano.

32.   In mid-March 2017, Mr. Lara learned a CreditOne Bank Visa card was received at his previous address in Long Beach, California.  Mr. Lara had not ordered a CreditOne card and advised CreditOne the card was opened fraudulently.  I learned from CreditOne that the card was applied for on March 10, 2017, the day HUAZA checked into the Key Inn and was later arrested by TPD in the early morning hours of March 11. During his arrest, HUAZA was discovered to be in possession of Mr. Lara's identification documents.  Additionally, the email address: HUAZAJR@YAHOO.COM (the SUBJECT ACCOUNT), which I believe to be used by HUAZA[15], was used to apply for the CreditOne Bank account.  Accordingly, I believe HUAZA stole Lara's identity to commit credit card fraud via the CreditOne Bank Visa card.

**D.   HUAZA Falsely Represented Himself as a Federal Agent to Local Police, Possessed Stolen Identification Documents, and Possessed Suspected Contraband on the SUBJECT DEVICE**

33.   On March 22, 2017, HUAZA was contacted by CMPD while attempting to defraud the inn-keeper of Nick's Pizza Ristorante Italiano in Costa Mesa, California, by attempting to depart without paying for his meal.  I have reviewed the CMPD reports, spoken with CMPD Ofc. Michelle Bradbury, and conducted my own follow up investigation regarding this encounter and learned the below information.

---

[15] During a search of law enforcement databases, I located the email address: HUAZAJR@YAHOO.COM (the SUBJECT ACCOUNT) linked to HUAZA's name, date of birth, and address.

18

34.    HUAZA met with two unidentified males and a female, claimed by HUAZA to be Maria Hejuarra, who all departed prior to HUAZA's attempt to leave Nick's Pizza. Upon initial contact with Ofc. Bradbury, which was audio recorded, HUAZA stated "I am an off-duty Federal Agent.  I work for the Homeland Security".  When the officer asked for HUAZA's name, he replied "Oscar Garcia-Henry" and provided a date of birth of "09-15-1984".  HUAZA later clarified to Ofc. Bradbury that he worked for Homeland Security in New York prior to moving to California a few months ago, but currently works for the U.S. Border Patrol ("USBP") in San Diego as a "Removal Officer".  When Ofc. Bradbury asked for HUAZA's supervisor's name, he provided "Steven 951-984-3100".  When the officer asked HUAZA to confirmed that "Steven" was HUAZA's supervisor, he clarified: "Homeland Security in San Diego, San Ysidro".  HUAZA then stated that the last name of "Steven" was "Morris".  HUAZA then claimed he was with the USBP, which is part of Customs and Border Protection, an arm of DHS.  HUAZA was unarmed and had no identification during this encounter.  Ofc. Bradbury contacted USBP Supervisory (Sup.) Agent Aricelia Sandoval and learned neither "Oscar Garcia-Henry" nor "Steven Morris" were listed as USBP agents in their directory.

35.    CMPD arrested HUAZA for defrauding an inn-keeper. During a post-arrest search of HUAZA, officers located a social security card belonging "Ashley Kathryn Johnson" (a resident of North Dakota), a NetSpend Mastercard Debit card belonging to "Jasmine Borden", assorted gift cards, an unnamed Visa Debit card,  T-Mobile SIM card packaging bearing Integrated Circuit

Card Identifier ("ICCID") 8901260805780242648F, a black Samsung smartphone (the SUBJECT DEVICE16) which HUAZA initially stated did not belong to him, and papers with handwritten numbers, including the stolen credit card number, expiration date, CVC code, work address, and work telephone number for Mrs. Sarah Dewing of Fort Atkinson, Wisconsin.

36.     During subsequent investigation I spoke to Ashley Kathryn Johnson, reviewed an Incident Report from the Fridley Police Department, and learned the social security card, bearing her name, was stolen in a vehicle burglary in Fridley, Minnesota on July 23, 2016.  Additionally, on the scrap of paper in HUAZA's possession, where I located the stolen credit card number of Sarah Dewing, there was another number written I believe to be a Mastercard number, expiration date, CVC code.  I spoke to Mrs. Dewing and learned her credit card information was compromised and used to fund HUAZA's Go-Go Grandparent account.  I also reviewed a Fort Atkinson, Wisconsin, police report that recorded

---

16 When HUAZA was arrested by CMPD, HUAZA was observed using, and was in possession of, a Samsung Galaxy that he initially denied ownership of, and later claimed he had just purchased.  The Samsung Galaxy utilized telephone number (949) 394-6872; however, in HUAZA's property was the packaging for a new T-Mobile Subscriber Identity Module ("SIM card").  A SIM card can easily be removed and replaced with a new SIM card with little to no expertise, thus allowing a user to easily change their telephone number with the same carrier (T-Mobile), while continuing to use the same mobile device.  I believe the Samsung Galaxy used to contact the complainant, the Samsung Galaxy HUAZA possessed during the TPD arrest, and Samsung Galaxy HUAZA possessed during the CMPD arrest to be the same device (the SUBJECT DEVICE).  Therefore, information and evidence could still be contained in the device memory, despite the change of the SIM card, unless it was deleted by HUAZA.

Mrs. Dewing's fraud complaint. In addition to Go-Go Grandparent, Mrs. Dewing's account was used for purchases at Clarion Hotels, Priceline.com, Expeida.com, and Subway restaurants.

37. Upon arrival at the CMPD jail, HUAZA provided the false name, along with social security number "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" to CMPD G4S Custody Ofc. K. Castellanos. Once HUAZA's fingerprints were electronically submitted, Ofc. Castellanos learned "Garcia-Henry" was actually HUAZA. Ofc. Castellanos informed Ofc. Bradbury and Ofc. Bradbury re-contacted USBP Sup. Sandoval, who verified the name "Oscar Eduardo Huaza-Lozano" was not listed in the USBP directory.

38. Prior to a post-arrest interview, Ofc. Bradbury, in the presence of CMPD Sergeant (Sgt.) Bang Le, read HUAZA his Miranda rights from a CMPD issued Miranda card. Ofc. Bradbury asked HUAZA if he understood each individual right after reading it and HUAZA replied "I do" to each of rights and consented to an interview by responding to Ofc. Bradbury's questions. The interview was recorded on video and audio and saved onto a disc. During the interview, HUAZA admitted his name was "Oscar Eduardo HUAZA-Lozano" and that he was not a USBP agent as he had claimed. HUAZA was asked a variety of questions regarding the March 22, 2017, incident.

a. HUAZA initially stated he resided in Long Beach at 1083 and 1084 East Market Street (addresses I confirmed do not exist), but later claimed he resided at 3050 South Bristol Avenue, Unit 8P, Santa Ana, California. (Based on my

investigation, I believe HUAZA's actual residence to be 3050
South Bristol Avenue, Unit 9P.)

      b.    When HUAZA was asked how he had gotten to Costa
Mesa, HUAZA told the investigators he had used the mobile
rideshare application "Lyft", which he also referred to as "Go-
Go Grandparent".  HUAZA was then asked if he had evidence
verifying the "Lyft" on the SUBJECT DEVICE.  HUAZA initially
denied the SUBJECT DEVICE belonged to him, stating that his
cellular telephone was taken by Hejuarra, who he claimed he met
at Nick's Pizza after responding to a Craigslist advertisement
to purchase video game googles for his son's birthday, which
HUAZA stated was that day.[17]  Though HUAZA initially stated the
SUBJECT DEVICE belonged to Hejuarra, HUAZA then changed his
story and claimed Hejuarra had lent the SUBJECT DEVICE to him to
use.  When asked how he accessed the SUBJECT DEVICE, HUAZA
stated he had set up a passcode and he could use his thumbprint.
HUAZA later changed his story again, stating he had purchased
the telephone from Hejuarra for $500.  HUAZA ultimately answered
the initial question and stated he had proof of his "Lyft" on
the SUBJECT DEVICE.  Ofc. Bradbury then asked HUAZA if he had
evidence of the Craigslist Ad on the SUBJECT DEVICE and HUAZA
replied he did.  Based on HUAZA's affirmative response, I
believe HUAZA either accessed the Craigslist website via an
online browser or utilized a mobile application, such as

---

[17] According to information in HUAZA's A-File, HUAZA's sons
were born in July 2007 and August 2003, thus I believe this
statement was false.

"Classifieds," which was observed on the home screen of the SUBJECT DEVICE[18]  Ofc. Bradbury asked, "So, you're ok with me going into your phone (THE SUBJECT DEVICE)"? and HUAZA replied "I mean . . . for sure.  I don't have a problem with that." HUAZA was asked for the SUBJECT DEVICE's passcode and provided the passcode of "0925,"[19] he also stated his thumbprint opened the SUBJECT DEVICE.

      c.   When asked who "Steven Morris" (the person HUAZA earlier claimed was his supervisor at USBP) was, HUAZA replied "he is one of the officers that help us… just one of the officers who give us all the info… he is based in San Ysidro". HUAZA was also asked for a telephone number for "Steven Morris" and for the names of the contacts that would help him (in DHS). HUAZA replied "They had different numbers. I will give you all the numbers that I got.  I got plenty of different numbers."

      d.   Ofc. Bradbury, in an attempt to elicit additional information about HUAZA, asked HUAZA to also provide telephone numbers for his family, so they could be documented, in case his family called the CMPD jail and wished to speak with HUAZA. HUAZA explained that since the Samsung Galaxy was not his actual telephone, he would use the device to access his Google account on the cloud (Internet) to access and provide the telephone numbers.  HUAZA stated "It is everything on my Google Account…

---

[18] The "Classifieds" mobile application was not opened to verify that it was connected to Craigslist.

[19] Based on HUAZA' s California Driver's License, HUAZA's date of birth is September (09) 25.

on my contacts." in reply to the telephone numbers Ofc. Bradbury
had requested.  I subsequently learned from my review of a law
enforcement database that HUAZA utilizes the Google Gmail
address "OHUAZA@GMAIL.COM.[20]"

**E.   Initial Consent Review of The Subject Device**

39.   I, along with Ofc. Bradbury, pursuant to HUAZA's
verbal consent to search the phone for evidence of the "Lyft"
account, the Craigslist advertisement, and for DHS employee
Steven Morris' contact information, powered the SUBJECT DEVICE on
and saw a variety of pop-up messages on the front screen,
including a promotional message from "UberEATS LA".  "UberEATS"
is a food delivery app.  I unlocked the SUBJECT DEVICE, with Ofc.
Bradbury, utilizing the passcode "0925", which HUAZA provided.
Due to the discrepancy regarding the ownership of the phone
(namely, whether it was HUAZA's or Hejuarra's) and to assure the
preservation of the rights of the SUBJECT DEVICE's true owner,
the phone's ICCID was checked and found to match the T-Mobile
card in HUAZA's property.  Additionally, the telephone's name was
checked by locating the information for the SUBJECT DEVICE in the
contact list of the telephone, where the SUBJECT DEVICE's
assigned telephone number and the user designated name are
displayed. The screen showed "Oscar Huaza" with the number "1
949-394-6872".  Thus, I believe that, despite what HUAZA had

---

[20] During a search of law enforcement databases, I located
the email address: OHUAZA@GMAIL.COM linked to HUAZA's name, date
of birth, and address.

initially told investigators, HUAZA was the true owner and operator of the SUBJECT DEVICE.

40. I then sought to verify HUAZA's claim of using the "Lyft" service by checking for the "Lyft" mobile application, which was not located.21  I then checked for a text message confirmation from "Lyft" or "Uber", but none was located.  I then searched for a folder titled "Gallery" or "Photos", which are common names for the storage location that contains photographs, saved images, and screenshots the user captures, to ascertain if a screen capture of any ride sharing application confirmation was preserved, but none was located.  While scrolling through the applications to locate the "Gallery" folder, I observed the following mobile applications in plain view: "Free Gift Card Generator," "Bin Checker," "Lens," "ID Photo," "Barcode Keyboard Se. . .," and "Credit Card Revealer."  Based on my training and experience, I know that these apps are used for a variety of purposes, including: verifying bank credit and debit card numbers, generating fraudulent bank credit card and gift card numbers based on algorithms, generating missing numbers from partial credit or debit card numbers, identifying credit and debit card issuers from their numbers only, identifying card numbers by scanning the barcode on the rear of a gift card, and for taking and cropping photographs for use on identity documents.

---

21 Additionally, I did not observe an application for "Uber," despite having seen a message from "UBEREATS LA" when the SUBJECT DEVICE was activated.

41.   In addition, inside the "Gallery" folder, in plain view, I observed preview images of what appeared to be photographs of a California Driver's License with HUAZA's face, another photograph of HUAZA's face cropped out from the Driver's License, a picture with two females, and a created "International Driver's License" with the picture of the two females pictured in the other photograph.  Based on my training and experience, I believe that these photos suggest that HUAZA uses the SUBJECT DEVICE and mobile applications to capture images and crop the photographs to create fictitious identification documents.  I believe the pictures contained evidence of a fraudulently created fictitious "International Driver's License" and HUAZA's face photograph was cropped from his California Driver's License to be placed on another identification document.

42.   Due to the photographs and the mobile applications observed in plain view during the consent search of the SUBJECT DEVICE, and based upon my training and experience with financial investigations, identity theft investigations, and other forms of credit card fraud, I believe there is evidence on the SUBJECT DEVICE of identity theft and credit card fraud.

43.   Despite that HUAZA had consented to the search of the SUBJECT DEVICE, after my initial review had identified suspected evidence of identity theft and other fraud crimes, in the abundance of caution I terminated the search in order to apply for the requested warrant. After ceasing the search, I extracted the data from the SUBJECT DEVICE utilizing a law enforcement program in order to preserve the evidence and prevent it from

being destroyed, altered, or otherwise lost.  The data on the SUBJECT DEVICE was stored on a disc, which was not searched, and secured pending this application.

44.   Ofc. Bradbury brought the SUBJECT DEVICE to HUAZA in the interview room and HUAZA verbally repeated the passcode for Ofc. Bradbury to unlock the device.  HUAZA then assisted Ofc. Bradbury in searching the contents of the SUBJECT DEVICE.  HUAZA offered to log into his Google account to retrieve information for Ofc. Bradbury.  HUAZA provided the telephone numbers for his sons, Bryant and Justin, Hejuarra, and Go-Go Grandparent.  HUAZA stated Go-Go Grandparent could be contacted to verify his travel and offered no proof of the Craigslist advertisement.  The SUBJECT DEVICE was then secured and returned to HUAZA upon his release from CMPD, shortly after the conclusion of his interview, in order to further my investigation and not alert HUAZA or his conspirators that they remained under investigation.[22]

## V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

45.   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that it is not always possible to search digital devices for digital data in

---

[22] Corroborating the concern of alerting HUAZA to the investigation, I believed that HUAZA had changed his telephone number soon after being released after his arrest by TPD on March 11, 2107, despite having utilized the previous telephone number since at least 2011.  I believe this to be true because it appeared that HUAZA has the same Samsung Galaxy (the SUBJECT DEVICE), but had acquired and installed a new SIM card prior to being arrested by CMPD.

a single day or even over several weeks for a number of reasons, including the following:

      a.  Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, operating system, and software application being searched.

      b.  Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

      c.  Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital

28

devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the device that can reveal information such as online nicknames and passwords.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.

        d.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device.  Analysis of the digital device as a whole to demonstrate the

29

absence of particular data requires specialized tools and a
controlled laboratory environment, and can require substantial
time.

   e. Digital device users can attempt to conceal data
within digital devices through a number of methods, including
the use of innocuous or misleading filenames and extensions.
For example, files with the extension ".jpg" often are image
files; however, a user can easily change the extension to ".txt"
to conceal the image and make it appear that the file contains
text.  Digital device users can also attempt to conceal data by
using encryption, which means that a password or device, such as
a "dongle" or "keycard," is necessary to decrypt the data into
readable form.  In addition, digital device users can conceal
data within another seemingly unrelated and innocuous file in a
process called "steganography."  For example, by using
steganography a digital device user can conceal text in an image
file that cannot be viewed when the image file is opened.
Digital devices may also contain "booby traps" that destroy or
alter data if certain procedures are not scrupulously followed.
A substantial amount of time is necessary to extract and sort
through data that is concealed, encrypted, or subject to booby
traps, to determine whether it is evidence, contraband or
instrumentalities of a crime.

  46. Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

## VI.   <u>CONCLUSION</u>

47.   For the reasons described above, I respectfully submit there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses will be found on the SUBJECT DEVICE.

_____
Jeremy M. O'Hara,
Senior Special Agent
DHS-ICE-OPR

Subscribed to and sworn before me
this _____ day of May, 2017.


_____
UNITED STATES MAGISTRATE JUDGE